## Ex Parte John Walker.

### No. 2998. Decided May 3, 1905.

**Murder—Habeas Corpus—Denial of Bail.**

See record for evidence held to be sufficient for a denial of bail in habeas corpus proceedings before a district judge, upon a charge of murder after indictment.

From McCulloch County.

Appeal from the order of Hon. J. W. Goodwin, District Judge, denying bail in habeas corpus proceedings.

The following were the facts introduced in evidence: Oscar Devore,

witness for State, being sworn said: "My name is Oscar Devore. I live on Calf Creek. I know the defendant, John Walker. I knew the man, O. E. Elliott, when he was living. He is now dead. I was present when said O. E. Elliott met his death. He met his death in McCulloch County, Texas. I was south of the shop of G. W. Walker when O. E. Elliott met his death, about twenty feet south of the shop. The shop faces east. There are two doors in the shop, one in the east end and one in the south. When I was twenty feet south of the shop John Walker was in the shop. I saw O. E. Elliott about this time. He was coming from Mr. Tucker's store going north. The public road runs just in front of this blacksmith shop. O. E. Elliott was in this road, coming from the south and going north. He was horse-back. As Elliott got even with the south-east corner of this shop I saw defendant fire at Elliott. At time John Walker fired this shot, he stepped out of the south door of the blacksmith shop, at the south-east corner of the shop, Elliott was in the road about even with the southeast corner of the shop. The south door is back from the southeast corner about three or four feet. I saw John Walker as he stepped out of the south door. He fired one shot at Elliott just after he stepped out of the door. Mr. Elliott was riding along the road. When the first shot was fired Mr. Elliott lent forward and began spurring his horse in attempt to get away. John Walker ran around the corner of the house towards the way Elliott was going. I heard two more shots. I do not know who fired them. Mr. Elliott was about even with the south-east corner of the shop when the first shot was fired. He had his left side towards the shop. After the first shot John Walker went around the corner of the house towards the direction that Mr. Elliott was going. After John Walker passed the corner of the shop I could not see Walker as the corner of the shop was between me and Walker and I saw no more of the difficulty. I saw no firearms on the horse of Elliott or about the person of Elliott. I saw a winchester scabbard on the left side of Elliott's saddle. I saw no gun in it. I had seen two winchesters in the blacksmith shop that morning before the shooting. Just before the shooting I saw the defendant and his father, Mr. Walker, in the shop, they were standing near the east door. A man standing in the east door of the shop could see anyone coming from the Tucker store all the way to the shop. It is about two hundred or three hundred yards from the shop to Tucker's store. I had been in the shop from early in the morning until the time of the shooting. I noticed a winchester in the shop when I first got there in the morning. I saw John Walker bring another winchester to the shop that morning. I heard John Walker say that he didn't want any one monkeying with his gun. He placed same in the south-east corner of the blacksmith shop. I saw a wound on the horse of Elliott, it was on his left hip. I made no examination of Elliott."

On cross-examination witness testified as follows: " I do not know

what time it was the shooting was done, but it was some time in the morning. It was only a few minutes after I left the shop until the shooting was done. The last time I saw the defendant and his father, which was a short time before I left the shop, they were standing from three to five feet back from the east door. They were standing in the shop. I had not noticed Elliott before I stepped out of the shop. I did not notice him before the shooting occurred. I noticed him coming down the road just before the shooting. He was something like fifty yards from the shop when I noticed him. There was nothing particular to attract my attention Elliott to look at him all the time until he was shot. I could see a man riding up that road from Tucker's store when standing in the shop and looking out of the south door. I was something like about twenty feet from the shop when the shooting occurred. I was due south of the shop. When the first shot was fired I was looking at Mr. John Walker. I saw Elliott after the first shot was fired and before he fell. After the first shot I saw Elliott lean forward and he began spurring his horse. The horse began to move faster. I do not know whether the horse moved faster from the fact that he was spurred or from the effect of the shot. I saw him kicking his horse. From the time of the first shot until Elliott went out of my sight it was about five or eight feet. Elliott was about fifteen or twenty feet east of the shop when the first shot was fired. I did not move from the time the first shot was fired before the second shot was fired. It was some time during that morning, something like one and one-half or two hours that defendant brought his gun to the shop, and before the time of the shooting. I have been acquainted with Mr. Elliott since January, 1904. I have never heard Elliott say anything about Mr. Walker, about expecting to have trouble with him. I went to the shop that morning to have a gun fixed. I was trying to train the gun. This defendant and his father were helping me. I do not know who the other gun in the shop belonged to. I think it was out of repair. The other gun was a winchester."

Redirect:

"This other gun was a winchester gun and my understanding was that it would not throw the cartridges out."

C. W. Tucker, witness for the State, being sworn testified as follows: " My name is C. W. Tucker. I know the defendant, John Walker. I knew O. E. Elliott during his life time. I knew him when he met his death. I was at home working on a chimney when he met his death. I know where the blacksmith shop of G. W. Walker is. It is between two hundred and three hundred yards from my house to G. W. Walker's blacksmith shop. I think it was about the 10th day of December, 1904, when Mr. Elliott met his death. There is a road running past my house and the shop of Mr. Walker, called the Brady and London road. My house is on the east side of this road and the blacksmith shop is on the west. My house is two hundred or three

hundred yards south of the shop. I had seen O. E. Elliott that morn-
ing, he was at my place. I have a store near my residence, some twenty
or thirty yards from same. I know where A. B. Carnes lived at that
time. He lived north-east of the shop, and on the same side of the
road on which I lived. In going from my house to Mr. Carnes you
would travel the road running immediately in front of the shop. The
front of the blacksmith shop makes part of the fence on the west
of the lane, that is, the fence joins the corner of the shop at its north-
east corner and also at the south-east corner. There is a wire gate
at or near the south-east corner of the shop. The gate is fastened to
a post at the south-east corner of the shop, and when you shut the gate
you fasten it to a post right against the south-east corner of the shop.
I do not know whether or not this gate was open at the time of the
shooting of O. E. Elliott. Mr. Elliott was at my place about fifteen
minutes before the shooting. I saw him ride from my place up towards
the blacksmith shop just before the shooting. He was right near the
blacksmith shop when I last saw him. I had just turned my eyes
off, when I heard the shot of the gun, and immediately turned my
eyes that way again, when I saw the smoke of a gun, and heard the
second shot fired. The last time I saw Elliott before I heard the first
shot, Elliott was riding along very slowly. I think his horse was in
a slow walk. When I looked back after the first shot I saw Elliott
lean forward and he seemed to be trying to make his horse run, and
heard him hollow. I could not tell what he said when he hollowed.
After I looked back at him, just as the second shot was fired, Elliott run
on up the road and Walker ran out in the road and fired the third
shot, Elliott's horse continued to run on up the road about thirty-five
yards, when Elliott jumped off his horse and continued running on
foot on up the road north, and bearing in towards the west string of the
lane fence. He ran about thirty-five or forty yards on foot when he
fell. After the third shot Mr. Walker continued to follow Mr. Elliott
on up the road. He followed him to about fifteen or twenty steps
of where Mr. Elliott fell. After Elliott jumped off his horse, de-
fendant kept following him and raised his gun a time or two as if
to shoot. G. W. Walker and myself kept hollowing at him not to
shoot any more. At each time we would hollow to him not to shoot
he would lower his gun and follow on and then raise again as if to
shoot when we would again hollow at him, after the deceased had
fallen and after the defendant had gotten up within fifteen or twenty
yards of deceased, the defendant again raised his gun as if to shoot,
when we again hollowed at him, when he looked back at us and then
turned and walked back towards the shop. At the time the second
shot was fired Elliott seemed to be trying to get away and was leaning
over as if to dodge, and was trying to get his horse to move out. At
the time of the third shot he was trying to get away. At the time of
the third shot defendant was in the road behind Elliott. At the time
of the second shot Elliott was about in front of the door and the shot

seemed to come from near the front of the door. The defendant had gone about fifty feet from the time he fired the first shot until he fired the last shot. I remember showing J. W. Matthews, the County Attorney and the District Attorney the place where the shooting occurred on the afternoon of the day it took place. I showed them the place where the first shot was fired, the place where the second shot was fired, and the place where the last shot was fired. I showed them these different places correctly to the best of my knowledge and belief at the time, I also showed them the place where the defendant turned back where he made as if to shoot the last time, the place where the deceased jumped off his horse and the place where he fell. I went to the body soon after it fell and was in sight of it from the time it fell until the officers got there that afternoon. I was present when the District Attorney searched the body looking through the pockets, etc. I think I was at the body all the time until this search was made. I know that either Mr. Stapp, Mr. Stockard, or myself were there all the time. I saw the District Attorney take a thorough search of the person of the deceased for weapons, going all over the body from the head to the feet, turning the pockets wrong side out, etc. There were no weapons found on or about the body. I also saw the horse ridden by the deceased that morning. I examined the saddle on the horse. Found an empty winchester scabbard on said saddle, but no winchester or gun of any kind. The winchester of deceased was at my store at the time of the killing. The winchester scabbard was on the left hand side of the saddle. I saw a gun shot wound on the horse of the deceased. This wound was on the slope of the hip, about two or three inches to the left of the back bone of said horse. The entrance and exit of the bullet was very plain, and about ten inches apart. The two holes were about on parallel line with the back bone of the horse. The defendant was running along down the road after the deceased before he fell. I examined the body of deceased for gun shot wounds and found two gun shot wounds. He was shot in front of the pit of the stomach, this was a glancing shot on the left side but entered and took a plug out of the right side of the belly. The other shot entered his side just above his left hip and came out just above his collar bone on the right side.

Cross-examination:

The second shot was fired just about the time I looked in that direction, that was immediately after the first. I recognized the defendant just as he ran out in the road after the second shot was fired. I think he was about fifteen or thirty feet from the shop door when the third shot was fired. I think about thirty-five yards from the shop door to where Elliott got off his horse. I think the defendant was about thirty feet or forty feet from Elliott when Elliott got off his horse. I think the defendant was about fifteen steps from deceased when deceased fell. Elliott's horse seemed to be jumping up, Elliott seemed to be trying to make him go faster, but the horse seemed to be

jumping up and not going forward very fast, seemed to be prancing.   De-
fendant was going a little faster than a walk and not as fast as a man
running a race, down the road after Elliott.  I have heard the de-
ceased say several times that he did not want Walker to talk to him,
that if he would go on and not speak to him he would not· hurt him.
And asked me to tell him so.   I told the defendant what the deceased
had said.   I heard the deceased say on the day before he was killed that
he met John Walker somewhere in the road near my store and deceased
said that Walker looked wild, and that if he had had his old gun he
would have made him tare out.   One from the blacksmith shop could see
any one with a winchester at my store.   I do not know Elliott's gun.
The gun at the store was one that the children of Elliott claimed.
Elliott carried a gun right often.

Redirect:

The last conversation I had with Mr. Elliott with reference to
his feelings toward the defendant, Elliott told me that since he had
found out something about the matter, his feelings were kinder to-
wards the defendant than they had been and that he intended to leave
the defendant alone if the defendant would not trouble· him.   In this
conversation he was talking to me about the defendant going off with
his, Elliott's, wife.   I saw defendant about two days before the killing
and told him of this conversation, and defendant said that he liked
deceased, that there were others out there he had more against then
he did deceased.   As I was going down the road towards the body of
deceased, I saw defendant; he was out in the pasture between the road
and the house, that is when I first seen him, when I first went down
there.   I hollowed and asked him to tell his father to come down.

Re-cross:

I told the deceased the contents of some letters, which defend-
ant had shown me, which he had received from Elliott's wife in which
she had asked defendant to come to see her that she wanted to go off
with him.   Deceased told me about two months before the killing that
he, deceased, had shot at defendant.

Redirect:

The deceased told me that he suspicioned that defendant was com-
ing to his house, and he, deceased, put out the report that he was
going to a neighbors to set up that night, but did not go, that that
night some one threw gravel against his house and he went to the door
and discovered John Walker near the house, and that he, Elliott, stepped
back and got his gun and shot at Walker, that he knew that it was
Walker for he had hunted with him too much and knew him too
well, knew a certain trot he had."

Testimony of witness, D. J. Childers, for defense:  " I live in
McCulloch County, in the south-western part of said county.   I was
acquainted with O. E. Elliott.  I knew nothing about the killing, I
was about three hundred yards of where the killing took place.   I
was out in Mr. Walker's pasture on a hill.   I could not see where the

killing took place. I never had any talk with defendant or deceased about the killing. I have never talked with defendant about the matter. I was south-east of the place where the killing took place, about one hundred and fifty yards south of due east. One of the bullets from the shooting came very near hitting me, it struck about five [inches?] from where I was. This is all I know about the matter.

Cross-examination:

I heard the shots. I could not tell whether it was the first or second shot that came so close to me.

Redirect:

There were three shots in all."

Testimony of witness, J. H. Shanks, for defense: " I live at Milburn. I know nothing of this case whatever. I suppose I was at home on the day of the killing. I have seen Walker a few times. I never knew Elliott. I never talked with Walker about the killing. I do not know why I was subpœnaed here to-day. I was not a witness before the grand jury in this case. I saw Walker last Fall, he passed my house, he told me then that he was in some kind of trouble, but did not tell me what kind of trouble it was or who with. He did not make any threats against anybody if he did I do not remember anything about it."

Testimony of witness, H. S. Espy, for defense: " I live in McCulloch County. I was living last December on the Menardville road about thirteen miles from town. I know but very little about this case. About two weeks before this killing he, Elliott, was in town here and he was putting up his team at the wagon yard, where the yard was crowded. I had a conversation here in town with deceased some time before the killing in which he, Elliott, told me that he would not hurt a hair of Walker's head, if he would only leave him alone. That defendant had probably not done more then many other men would do under similar circumstances. I did not tell Walker about this conversation."

Testimony of witness, James A. Whitley, for defense: " I live out on Calf Creek in McCulloch County. I know but little about this case. After Mr. Elliott's wife had left with Mr. Walker, she left on Friday night, he sent for me to come over to see him, I knew that I had to be away, and so went to see him Saturday night. He talked with me about his troubles. I told him to stay at home and take care of his children. He told me that he did not intend to harm Walker unless he met him, that if he met Walker it might cause him to do something that he ought not to do, that so long as Walker kept out of his way that he would do him no harm. This was the only time I talked with Elliott. I never told John Walker about this conversation. I never told Walker's father about it. Some time later in the Fall I met Walker's father and I in substance told him just what Elliott had told me. I never had any talk whatever with defendant about the

matter. The conversation referred to with Walker's father was before the killing."

Testimony of witness, G. W. Stapp, for defense: " I knew O. E. Elliott. Some two weeks or months before the killing O. E. Elliott told me that he had caught on to the fact that defendant was too intimate with his wife, that he was down at defendant's father's and mentioned in defendant's presence that he was going to set up that night with Joe Stapp, who was sick, that he spoke this way so that John Walker would think that he would be away from home, that he went home and asked his wife to go with him to Stapp's house that night, but she said she would not go, which made him think still stronger that something was wrong, so that he did not go himself, that he said that he intended to kill Walker if he came there. He said that later on in the night he heard a rock fall on the house and he stepped to the door and John Walker was standing at the gate, that when John Walker saw him that he, Walker, started to run off, when he, Elliott, shot at him twice. That about eight or ten years ago there came up some trouble of the same nature between his wife and another man, but that on account of a small child he did not leave her, but kept living with her in hopes that she would do better. He said, "I came over here yesterday to ask you to do a favor for me," and I asked him what it was, and he said this: "When John Walker comes back here I want you to get him and go hunting with him and tell me which way you are going that I am going to kill that man."

I told him I could not do such a thing for him or any one else, that it would get me in trouble that I could not get out of, that I would not do that for him or any one else. He said: "Yes you can get out of that very easy" he said "you have a winchester and I will have a shot gun," that he would shoot him with the shot gun and I could get out of it very easy. I asked him, 'Mr. Elliott why do you ask me to do this for you?' and he stated that it was because John and I had been hunting several times together; he then went on and said that he was down at defendant's father's a few days ago where they were drilling a well, and that he and John were talking. That one of your girls and one of Mr. Walker's girls went down to the watermelon patch and got some watermelons and as they were coming back John said that he was going to have one of those melons and got up and started down and met the girls and caught witness's little girl around the waist and went to rubbing her up and down the breast and went to feeling of her titties, and said that if a man of that sort was to do a girl of mine that way that he would kill him. He said that Mr. Walker, defendant's father, was setting there and saw the same that he did. I went home and inquired of my daughter about this and she said that it was not true. I went next morning and asked Mr. Walker, defendant's father, about it, and he said that he knew nothing about it. I then told him the conversation that I had had with Elliott as above detailed. I saw defendant on the morning that Elliott was killed and

he told me that he wanted to ask me a question and that he wanted the truth. I told him that I would tell him the truth if I told him anything, and I asked him what it was, he said that his father had told him that I knew something that he ought to know so that he could be on the watch out, and he wanted to know what it was. I told him that his father had already told him and that I would not tell him anything about it and turned and started off. He called me back and told me that that fellow would likely be down here to-day, I then told him to wait until night, but he said no, he wanted to know now, so I turned around and told him about the conversation that I had had with Elliott. When I told him what Elliott had told me about his conduct with my little girl he said that if Mr. Elliott told that he had told a God damn lie. This was early in the morning before the shooting. It was about 12 o'clock when the shooting occurred. Cross-examination: I have lived in this county about one year. I came from Arkansas to this county. I have lived in Arkansas nearly all my life, was born and raised there. John Walker asked me on the morning of the killing if I would swear to the facts of the conversation had with Mr. Elliott, and I told him I would swear to it if I had to."

*Shropshire & Hughes* and *Jenkins & McCartney,* for relator.

*Howard Martin,* Assistant Attorney-General for the State.

HENDERSON, JUDGE.—Applicant, John Walker, after indictment found in the District Court of McCulloch County, against him for the murder of one O. E. Elliott, sued out writ of habeas corpus before the district judge, for bail. On the trial the district judge refused him bail and he was remanded to the custody of the sheriff; and from this action of the court applicant appeals. We have examined the record carefully, and in our opinion the district judge was justified in finding that the proof was evident, that applicant was guilty of a capital offense, and we see no reason to disturb the judgment of the lower court. The judgment is accordingly affirmed.

*Affirmed.*